# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 11, 2012

## STATE OF TENNESSEE v. ROBERT JASON BURDICK

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-CR-053486      Timothy L. Easter, Judge**

---

**No. M2012-01071-CCA-R3-CD - Filed June 11, 2013**

---

A Williamson County Circuit Court Jury convicted the appellant, Robert Jason Burdick, of rape, aggravated kidnapping, and aggravated burglary. The trial court imposed a total effective sentence of thirty years in the Tennessee Department of Correction. On appeal, the appellant challenges the trial court's denial of his motion to suppress, the sufficiency of the evidence sustaining his convictions, and the trial court's jury instructions regarding the kidnapping offense in light of State v. White, 362 S.W.3d 559 (Tenn. 2012). Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Vanessa P. Bryant, Kent K. Stanley (on appeal), Dana M. Ausbrooks (at trial), Franklin, Tennessee; John Herbison, Nashville, Tennessee (at trial); Fletcher Long, Edward T. Farmer (at trial), Springfield, Tennessee; and Carrie Gasaway, Clarksville, Tennessee (at trial), for the appellant, Robert Jason Burdick.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Kim R. Helper, District Attorney General; and Jessica Borne, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

At trial, the victim, K.A.,[1] testified that in November 2004, she was living on Williamsburg Road in Brentwood. On the night of November 3, her eleven-year-old daughter fell asleep around 9:00 or 9:30 p.m., and her husband went to bed shortly thereafter. The victim stayed in the great room, which she also referred to as the "green room," and fell asleep on the couch while watching television. The victim had not locked the French doors in the great room, which led outside, and the blinds on the windows were not completely closed. The victim woke when she felt someone wearing fingerless wool gloves place a hand over her eyes. The perpetrator told the victim, "Shush, don't say anything."

The victim said the perpetrator told her to get up and go to the doors to the deck. The victim, who was wearing only a white or cream-colored nightgown, complied with the perpetrator's order. She tried to be calm and looked straight forward in an attempt to not seem "confrontational." The perpetrator led her to the door and onto the deck; she did not walk out of the house voluntarily. The victim told the perpetrator, "I just want my family to be safe." She testified, "I don't particularly remember [if the perpetrator made] a response. 'They will be,' perhaps, but I can't remember."

The victim said that the perpetrator guided her down the steps of the deck and told her to walk toward the trees by the "creek line" at the eastern edge of the property. The location was "pretty remote from the house, from the driveway, [and] from the next house." The evening was dark and overcast, and the ground was wet from rain. The victim urinated on herself while walking. Eventually, the perpetrator pushed her to the ground, face first; covered her eyes with duct tape; and ordered her to undress. After she removed her nightgown, he told her to lie down, and she complied. The victim heard the perpetrator unzip his pants. When the victim was "half upright," the perpetrator pulled her head toward his pants and directed her hands toward his penis; he was not wearing a condom. The perpetrator ordered her to perform fellatio and told her, "Don't f[***] it up; you know what to do." She thought he was implying that he would react with violence if she tried to hurt him.

The victim said that after three or four minutes, the perpetrator removed his penis from her mouth. She heard him adjust the zipper on his pants, open a condom packet, and put on the condom. He leaned over her and rubbed, stroked, and kissed her breasts. From the contact, she discerned that he was wearing a wool ski mask that had an opening for his mouth. The victim lay flat on the ground, the perpetrator got on top of her, and he penetrated her vagina with his penis after using his saliva for lubrication. During intercourse, the perpetrator asked the victim to kiss him, and he kissed her breasts and put his tongue in her mouth. She was afraid and believed she had to cooperate or "the whole situation could spiral

---

[1]It is the policy of this court to refer to victims of sexual offenses by their initials.

out of control."

The victim said that after five or six minutes, the perpetrator withdrew his penis. She heard a dog barking nearby, startling them. The perpetrator told her, "Shush," and ordered her to get dressed. After she pulled on her nightgown, he guided her toward her house. The victim, who still had duct tape on her eyes, walked forward with her arms in front of her. She tripped and felt the perpetrator steady her and push her toward the bottom of the steps to the deck. At the bottom of the steps, the perpetrator told the victim to remove the tape from her eyes. She tried to remove it slowly, but he instructed her "rip it off" and took the tape from her. He told her, "Go up the steps, go inside the house, don't look back, and wait to call the police."

The victim said that she went up the stairs and, once she was inside the house, locked the door and closed the blinds. She looked in on her daughter, who was still sleeping. She made sure the rest of the doors in the house were locked then went to her bedroom. Her husband woke, and she told him that she had been raped. The victim and her husband went to the den because she felt safer in a room that was "not so open [and was] in the middle of the house." The victim told her husband the details of the incident, and he called the police. The victim smoked a cigarette to calm herself but did not shower, wash, change clothes, brush her teeth, use the bathroom, or drink water. She stated that she "wanted to make sure everything was preserved, conserved, and nothing disturbed."

The victim said that the police and paramedics responded to her house immediately. The paramedics took her, still wearing her nightgown, to the Williamson County Medical Center. When she arrived, the hospital staff had her stand on a plastic sheet on the floor and disrobe. They combed her hair, examined her body, and took photographs of her injuries and the mud and debris on her body. The staff performed a rape kit, collecting swabs from her mouth, the skin of her breast, and her vaginal region. While at the hospital, the victim told Detective Adrian Breedlove about the incident. The victim said that she did not know the appellant prior to the rape.

On cross-examination, the victim said that the dog she heard barking that night was a Boston Terrier and that the barking lasted for a couple of minutes until it was called by its owner. After the rape, the victim was bruised on her back, arm, and leg.

The victim's husband testified that when he went to bed on the night of November 3, 2004, the victim stayed awake to watch television. In the early morning hours of November 4, he was awakened by the victim's calling his name. The victim told him that she had been raped. She appeared disheveled and had "leaf debris" and wet spots on her nightgown. She was trembling and on the verge of crying. The victim's husband called the police and

-3-

reported the rape. The police quickly responded to the house, and the victim was taken to the hospital.

The victim's husband said that prior to the night of the rape, he had installed "motion-sensing lights" under the deck. After the rape, he checked the lights and found that the light bulbs had been unscrewed.

Al Dean Ketner testified that on November 4, 2004, he spent the night with his girlfriend, who lived next door to the victim. Around 1:00 or 1:30 a.m., he took his dog, a Boston Terrier, on a walk without a leash. Ketner said that the dog was normally quiet, but while they were outside, she began barking. The dog was "very agitated . . . [and] alarmed." Ketner looked around and saw a female on the ground and a male standing over her. Initially, Ketner thought the victim was outside with her husband. Ketner tried to call his dog back, but she continued to bark. Ketner saw the victim stand and hurriedly walk to her deck. Ketner and his dog returned to his girlfriend's house.

Ketner said that the next morning, he saw the police at the victim's house. He decided that the man he saw the previous evening must not have been the victim's husband. Accordingly, he went next door and told the detectives what he had seen.

Brentwood Police Detective Adrian Breedlove testified that in the early morning hours of November 4, 2004, his supervisor, Lieutenant Campsey, instructed him to go to the hospital, where he interviewed the victim about the incident. After the medical personnel were finished examining the victim, Detective Breedlove took possession of the evidence they had gathered, including the rape kit, and took the items to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing.

Brentwood Police Detective John Wood testified that early on the morning of November 4, 2004, he responded to a report of a rape on Williamsburg Road. When he arrived, the fire department, Lieutenant Campsey, and a couple of other detectives were at the scene. Lieutenant Campsey appointed Detective Wood to be the lead investigator. Detective Wood said that no fingerprints of any evidentiary value were found at the scene. Detective Wood noticed that the lights underneath the deck were loose, as if the bulbs "had been unscrewed just to the point to where they wouldn't light up." Detective Wood found cigarette butts in the back yard, and testing revealed the DNA of an unknown person.

Detective Wood said that after the TBI crime laboratory tested the swabs taken from the victim, a DNA profile of the perpetrator was found. However, at that time a match could not be made. Subsequently, in April 2008, the appellant was developed as a suspect, and a DNA sample was taken from him.

On cross-examination, Detective Wood said that when the victim returned home from the hospital, she showed Detective Wood the places where the incident occurred. He said that it was not raining when he was at the house but that it had been for quite a while earlier in the evening. The ground was wet, and he found a muddy shoe print on the deck. However, the print was not "very good" and did not assist in the investigation.

At the conclusion of Detective Wood's testimony, the parties entered the following stipulation:

> [T]he Tennessee Bureau of Investigation conducted its DNA comparison using a DNA sample obtained from the [appellant]. Following the taking of the sample in May of 2008, all proper procedures were followed to assure the integrity of the sample prior to the analysis by the Tennessee Bureau of Investigation.

Dr. Ronald Hagan, a Williamson County Medical Center emergency room physician, testified that he was working overnight on November 4, 2004, when the victim came into the emergency room. After the victim reported being raped, Dr. Hagan performed an examination. He saw a small bruise on the victim's lower abdomen above her pubic area and below her navel but could not estimate the age of the bruise.

Dr. Hagan said that he and Nurse Knotts performed a rape kit on the victim. Specifically, he collected vaginal swabs, oral swabs, and pubic hair "combings." Additionally, based upon the victim's report that the appellant kissed her breasts, Dr. Hagan collected swabs from the victim's breasts. He also took a blood sample from the victim and collected her nightgown.

Victoria S. Knotts, a registered nurse, testified that she was working at the Williamson County Medical Center when the victim came into the emergency room. She said that she had the victim stand on a sheet on the floor while removing her nightgown to preserve any evidence that might be dislodged during disrobing. Afterward, Knotts collected the nightgown and the sheet as evidence. She also collected as evidence the sheets and blankets the victim touched while being transported in the ambulance. Knotts assisted Dr. Hagen during the examination.

Agent Michael Turbeville, a forensic scientist with the TBI crime laboratory, testified that he examined the victim's nightgown and found dirt but no semen. He did not examine the sheets taken from the hospital because TBI policy was to examine the items "most intimate to the victim . . . [and] if there's a recovery of DNA evidence, then that is a point we stop." Agent Turbeville examined the vaginal swabs taken from the victim and found no

semen. He said there were many reasons for the lack of semen, such as the perpetrator not ejaculating, wearing a condom, or ejaculating somewhere other than the victim's vaginal area. The vaginal swab contained only the victim's DNA. Agent Turbeville said that no semen was found on the oral swabs. Agent Turbeville also examined the swabs taken from the victim's breasts and found the appellant's DNA. The DNA found on the cigarette butts retrieved from the scene did not match the appellant's DNA.

The State rested its case-in-chief, and the appellant elected not to put on proof. The jury found the appellant guilty of rape, aggravated kidnapping, and aggravated burglary. The trial court sentenced the appellant to twelve years for the rape conviction, twelve years for the aggravated kidnapping conviction, and six years for the aggravated burglary conviction. The court ordered the sentences to be served consecutively for a total effective sentence of thirty years.

On appeal, the appellant challenges the trial court's denial of his motion to suppress, the sufficiency of the evidence sustaining his convictions, and the trial court's jury instructions regarding the kidnapping offense in light of State v. White, 362 S.W.3d 559 (Tenn. 2012).

## II.  Analysis

A.  Motion to Suppress

Prior to trial, the appellant filed a motion to suppress evidence, alleging that it was obtained from an illegal stop of his vehicle. Specifically, he contended that the police did not have reasonable suspicion to stop his vehicle. He maintained:

> Information obtained during the illegal seizure led the police to suspect that he had committed a number of rapes over the past fourteen years. He was evasive when questioned by the police and lied to them about why he was in the neighborhood. This led them to investigate him further, which ultimately led to his arrest. Without that illegal seizure, the State would not have suspected him of these other crimes. Given the illegality of that seizure, all evidence against [the appellant] must be suppressed and cannot be used as proof against him.

In response, the State asserted that the police had reasonable suspicion to justify the stop. We agree with the State.

-6-

At the suppression hearing, Officer Elliott Hamm testified that on the night of April 28, 2008, he was working the midnight shift as a patrol officer. It had been raining on and off all evening. During roll call, Officer Hamm's supervisor cautioned the officers to be particularly observant because some of the rapes attributed to "The Wooded Rapist" had occurred in Brentwood on rainy nights. Around 12:30 a.m., police received a report that a suspicious person wearing dark clothing and a black ski mask was seen in the Meadow Lake Subdivision looking through the windows of parked vehicles with a flashlight. Officer Hamm knew that "The Wooded Rapist" had allegedly committed a previous rape in the area.

Officer Hamm explained, "The subdivision is laid out you come in off of Franklin Road, there's only one other way to come out, and it kind of takes back roads to get out of the subdivision." The houses were fifty to seventy-five yards from the road, and a tree line separated the back of the houses from a golf course. Officer Hamm said that he and five other officers responded to the area and, in compliance with "standard department policy," began looking for "anything out of the ordinary," including footprints in the wet ground or a car parked on the side of the road because a prowler would "have to get to that area in some form or fashion."

Officer Hamm said that he noticed a gray 2001 Jeep Grand Cherokee parked at Arnold Road, facing Meadow Lake Road. From his experience patrolling the area on previous occasions, he knew it was unusual for cars to be "parked on the side of the street at that time of the morning." Officer Hamm approached the vehicle and touched the hood. It was warm, indicating that the vehicle had not been parked for a substantial length of time. Officer Hamm looked inside the vehicle and saw that it was unoccupied. A black duffle bag was in the rear cargo area, a red baseball cap was on top of other items piled in the back seat, and a bottle of water and an unopened energy drink were in the center console. A computer search of the vehicle's license plate number revealed that the vehicle was registered to the appellant. The computer search also revealed the appellant's address, which was in Davidson County; his driving history; and his driver's license photograph. Afterward, Officer Hamm continued to search the area and investigated other parked vehicles.

Officer Hamm said that approximately one hour later, he decided to return to the place where the Jeep had been parked to determine "if the circumstances had changed surrounding the vehicle." As he was driving to the location, he saw the Jeep traveling on Meadow Lake Road toward the intersection with Franklin Road. From his past experience, Officer Hamm knew it was uncommon for someone to be "out on the streets in that subdivision during those early morning hours." Therefore, he activated his blue lights. The appellant, who was driving the Jeep, immediately stopped the vehicle. Officer Hamm said that he stopped the vehicle in order to identify the driver, ask where the driver had been, and to discover if the driver "had any relation to the call that we actually had at that particular time; the prowler

call."

Officer Hamm said that he approached the appellant, who was wearing camouflage pants, a gray cut-off t-shirt, and a red baseball cap. Officer Hamm asked for the appellant's driver's license and verified that the information on the license matched the information he had received from his earlier computer search. Officer Hamm told the appellant that he was investigating a report of a suspicious person using a flashlight to look in car windows in the area. The appellant said that he had not seen any suspicious activity. Officer Hamm then returned the appellant's driver's license. The appellant told Officer Hamm that he had been at a "gathering" at the house of his friend, Ricky Douglas, on the corner of Arnold Road and Meadow Lake. Officer Hamm asked for the appellant's contact information to fill out a "field interview card," and the appellant gave the officer his cellular telephone number. Officer Hamm asked for permission to search the appellant's vehicle, and the appellant refused. After asking "general questions" to complete the field interview card, Officer Hamm told the appellant he was free to leave. Officer Hamm estimated that the entire encounter lasted three to five minutes.

Officer Hamm said that after the appellant left, he searched the area for another forty-five minutes to one hour. He said that if he had seen any other vehicles, he would have stopped them. The next day, Officer Hamm went to the residence at the corner of Arnold Road and Meadow Lake. The residence was a duplex; the homeowner lived on one side, and her son and his family lived on the other. The homeowner told Officer Hamm that neither she nor her son had a "gathering" the previous evening.

On cross-examination, Officer Hamm said that he filled out the field interview card at approximately 4:00 or 4:30 a.m. on April 28, 2008, and that the card contained information obtained prior to and after the interview with the appellant. Officer Hamm acknowledged that although the 911 call reporting the prowler may have included an approximate height of the perpetrator, the description that was transmitted over the police radio did not include that detail. When Officer Hamm saw the appellant, he was not wearing a black ski mask, and Officer Hamm did not see a black ski mask or a flashlight in the appellant's vehicle. From the appellant's driver's license information, Officer Hamm learned that the appellant was five feet, eleven inches tall and weighed 200 pounds. On the night of the stop, the appellant was wearing "greenish . . . Army fatigue[]" camouflage pants and a "medium gray" t-shirt.

Officer Hamm said that he did not arrest the appellant that night or issue him a citation. He agreed that the appellant's story of his whereabouts that night was not significant until the story could not be verified. He acknowledged that "[e]xcept for this stop, [he] wouldn't have had a story to [verify]." He said that he would have stopped anyone that night "who looked out of place."

At the conclusion of the hearing, the trial court implicitly accredited the testimony of Officer Hamm and found that "there are more than ample articulable facts supporting the reasonable suspicion in this particular case." The court said that Officer Hamm "would have been derelict in his responsibilities as a police officer" if he had not made the investigatory stop. On appeal, the appellant challenges this ruling.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search or seizure is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000); see also State v. Hicks, 55 S.W.3d 515, 527 (Tenn. 2001). "Because stopping an automobile without a warrant and detaining its occupants unquestionably constitutes a seizure, the State . . . carrie[s] the burden of demonstrating the applicability of an exception to the warrant requirement." State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21 (1968), holding that a law enforcement officer may conduct a brief investigatory stop of an individual if the officer has a reasonable suspicion, based upon specific and articulable facts, that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). This standard also applies to the investigatory stop of a vehicle. Delaware v. Prouse, 440 U.S. 648, 663 (1979); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). In other words, a law enforcement officer may stop a vehicle if the officer possesses a reasonable suspicion supported by specific and articulable facts that an offense has been, is being, or is about to be committed. Watkins, 827 S.W.2d at 294.

The Supreme Court has observed that "[a]rticulating precisely what 'reasonable suspicion' . . . mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996); see also State v. Smith, 21 S.W.3d 251, 256 (Tenn. Crim. App. 1999). "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Ornelas, 517 U.S. at 696). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norwood, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); Watkins, 827 S.W.2d at 294. These circumstances include, but are not limited to, "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Watkins, 827 S.W.2d at 294 (citation omitted).

We acknowledge that the appellant was seized when Officer Hamm activated his patrol car's blue lights. See Binette, 33 S.W.3d at 218; see also State v. James David Moats, __ S.W.3d __, No. E2010-02013-SC-R11-CD, 2013 WL 1181967, at *13 (Tenn. at Knoxville, Mar. 22, 2013). Therefore, the police needed to have developed reasonable suspicion by that point. Our supreme court has explained that

> "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). In other words, reasonable suspicion is "'something more than an inchoate and unparticularized suspicion or hunch . . . [but] considerably less than proof of wrongdoing by a preponderance of the evidence.'" State v. Yeargan, 958 S.W.2d 626, 632 (Tenn. 1997) (quoting Sokolow, 490 U.S. at 7-8).

In the instant case, the trial court found that on the night of April 28, 2008, Officer Hamm had been cautioned by his supervisors to be particularly observant for any activity that might be related to "The Wooded Rapist," who had committed several offenses in wooded areas on rainy nights. Later that evening, Officer Hamm responded to a report of an intruder peeping into cars in the Meadow Lake Subdivision. The night was rainy, and

the area was wooded. While patrolling the area looking for the perpetrator, Officer Hamm saw the appellant's Jeep parked on the side of the road. The vehicle was warm, indicating that it had been recently driven. A duffle bag and a red baseball cap were inside the vehicle. Based upon his experience, Officer Hamm knew that it was unusual for vehicles to be parked on the side of the street in that subdivision at that time of night. Approximately one hour later, Officer Hamm saw the appellant driving the vehicle in the area. Officer Hamm stopped the appellant to investigate and obtained the appellant's name, telephone number, and reason for being in the area. The stop lasted three to five minutes. The trial court found that based on the foregoing facts, Officer Hamm had reasonable suspicion that an offense had been, was being, or was about to be committed. Therefore, the stop was valid. Previous panels of this court have addressed this specific issue and have concluded that the stop of the appellant's vehicle was valid; we agree. See State v. Robert Jason Burdick, No. M2011-01299-CCA-R3-CD, 2012 WL 2151489, at *11 (Tenn. Crim. App. at Nashville, June 13, 2012), perm. to appeal denied, (Tenn. 2012); State v. Robert Jason Burdick, No. M2009-02085-CCA-R3-CD, 2012 WL 1366359, at *10 (Tenn. Crim. App. at Nashville, Apr. 18, 2012), perm. to appeal denied, (Tenn. 2012). We conclude that the appellant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The appellant argues that the evidence was insufficient to sustain his convictions of rape and aggravated burglary. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

### 1. Rape and Aggravated Burglary

Rape is defined as the "unlawful sexual penetration of a victim by the defendant or of the defendant . . . [and f]orce or coercion is used to accomplish the act" Tenn. Code Ann.

§ 39-13-503(a)(1). "'Sexual penetration' means sexual intercourse . . . , or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). This court has previously stated that the term "unlawful" generally refers to non-consensual acts. See State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994). Specifically, the State charged the appellant with the vaginal rape of the victim. Additionally, an aggravated burglary occurs when a person, without the effective consent of the property owner, enters a habitation, such as a person's residence, with the intent to commit a felony, theft, or assault. See Tenn. Code Ann. §§ 39-14-401(1)(A), -402(a)(1), and -403(a).

The evidence, viewed in the light most favorable to the State, revealed that the victim was awakened when someone wearing fingerless gloves placed a hand over her eyes and told her to be quiet. The perpetrator led the victim, against her will, outside and away from the house to a wooded area. He covered her eyes with duct tape and told her to disrobe, get on the ground, and perform fellatio. Thereafter, the perpetrator put on a condom, got on top of the victim, and penetrated her vagina with his penis. He kissed her breasts during intercourse. When they heard a dog barking, the perpetrator guided the victim back to the house, removed the duct tape, and instructed her to delay calling the police. The victim's husband discovered that the motion lights underneath the deck had been loosened so that they would not come on. Ketner confirmed that he was walking his dog and saw the victim outside with an unidentified male. Testing revealed that a swab of saliva taken from the victim's breast contained the appellant's DNA. We conclude that the foregoing evidence was sufficient to sustain the appellant's convictions for rape and aggravated burglary.

2. Aggravated Kidnapping

As his final issue, the appellant contends that he should be granted a new trial on the aggravated kidnapping charge, maintaining that the trial court erred in failing to charge the jury in accordance with State v. White, 362 S.W.3d 559 (Tenn. 2012), which was released after the appellant's trial but before the hearing on his motion for new trial. In response, the State asserts that the error, if any, was harmless.

Tennessee Code Annotated section 39-13-304(a)(1) defines aggravated kidnapping as "false imprisonment, as defined in § 39-13-302, committed . . . [t]o facilitate the commission of any felony or flight thereafter." False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. Tenn. Code Ann. § 39-13-302(a). Our case law reveals a long-standing issue regarding the legitimacy of a kidnapping conviction when the act(s) establishing the offense occurred during an accompanying felony. In State v. Anthony, 817 S.W.2d 299, 306

(Tenn. 1991), our supreme court, citing due process concerns, held that before a separate kidnapping conviction may be sustained, there must be a determination of

> whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony and [was] not, therefore, sufficient to support a separate conviction for kidnapping, or whether it [was] significant enough, in and of itself, to warrant independent prosecution and [was], therefore, sufficient to support such conviction.

Later, in State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997), our supreme court modified the Anthony court's "essentially incidental" analysis and established a two prong test for determining whether a separate conviction for kidnapping violates due process. The first step concerned a determination of whether the movement or confinement was beyond that necessary to commit the accompanying felony. Id. If so, the second step concerned ascertaining whether the additional movement or confinement (1) prevented the victim from summoning help; (2) lessened the appellant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id.

Recently, in State v. White, 362 S.W.3d 559 (Tenn. 2012), our supreme court expressly overruled Anthony and its progeny, holding that "[t]he separate due process test articulated first in Anthony, and subsequently refined in Dixon . . . , is . . . no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." Id. at 578. Instead, the court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law," thereby concluding that a defendant's constitutional concerns are protected by appellate review of the sufficiency of the convicting evidence. Id. at 577-78. Therefore, our supreme court cautioned that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." Id. To effectuate this end, our supreme court devised an instruction to be given by trial courts:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the

case, including, but not limited to, the following factors:

> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
>
> • whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
>
> • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
>
> • whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81 (footnote omitted).

Regarding the appellant's claim, we must first determine whether White is applicable. The appellant's trial occurred on November 30 and December 1, 2011, before the opinion was issued. The trial court instructed the jury in accordance with the pattern jury instruction in effect at that time:

> Any person who commits the offense of aggravated kidnapping is guilty of a crime.
>
> For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence

of the following essential elements:

> (1) That the Defendant knowingly removed or confined [the victim] unlawfully so as to interfere substantially with [the victim's] liberty; and

> (2) That the Defendant did so to facilitate the commission of the offense of rape or flight thereafter.

> Rape has been previously identified for you in these instructions.

> A removal or confinement is unlawful if accomplished by force, threat, or fraud.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.02 (14th ed.). Thereafter, on March 9, 2012, our supreme court filed White. On March 16, 2012, the appellant timely filed his motion for new trial, arguing that the trial court erred.

The appellant contends that his case is in the same procedural posture as the defendant in White. He asserts that while White does not apply retroactively to provide a collateral attack on a conviction, it nevertheless does apply retroactively to cases that are pending direct appeal at the time the opinion was filed. The State contends that the supreme court expressly stated that its ruling in White "does not articulate a new rule of constitutional law or require retroactive application." 362 S.W.3d at 578. Thereby, the State essentially maintains that White is not applicable to the instant case. We agree with the appellant.

This court has addressed this issue and concluded that our supreme court "intended retroactive application of the ruling to those already tried cases in the appellate pipeline, that is pending direct appeal, at the time it was filed and that its use of the word 'retroactive' was intended to prevent use of the ruling for collateral attack." State v. Bennie Osby, No. W2012-00408-CCA-R3-CD, 2012 WL 5381371, at *7 (Tenn. Crim. App. at Jackson, Nov. 2, 2012), perm. to appeal denied, (Tenn. 2013). Accordingly, we conclude that White was applicable to the instant case.

Moreover, the instruction given by the trial court was virtually the same as that given in White. The White court stated that "[w]hile these instructions track the statutory language, they did not define the key element—the substantial interference with the victim's liberty—as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." White, 362 S.W.3d at 580; see

-15-

also State v. Michael L. Powell, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279, at *9 (Tenn. Crim. App. at Knoxville, May 10, 2012). Therefore, "the same jury instruction error that attended . . . White's conviction exists here." State v. David Earl Scott, No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *13 (Tenn. Crim. App. at Knoxville, Nov. 14, 2012), perm. to appeal denied, (Tenn. 2013).

Finally, we must determine the effect of the error. See Tenn. R. App. P. 36(b). The concern in the instant case is a non-structural constitutional error; accordingly, the test to determine whether the error is harmless is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. David Hooper Climer, Jr., __ S.W.3d __, No. W2010-01667-SC-R11-CD, 2013 WL 1694804, at *27 (Tenn. at Jackson, Apr. 19, 2013) (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

At the hearing on the motion for new trial, which, as we have noted, was post-White, the trial court acknowledged that "if we were trying this case . . . today or tomorrow, we would be giving a different charge." However, the court found that the charge given "was the proper instruction at the time." Nevertheless, the court found that if the charge was error, it was harmless. Specifically, the court stated:

> [I]n reviewing the White case I am satisfied that in this case there were several of the factors which are set forth in the new opinion, in the White opinion that were supported by the evidence in this case . . . . The removal or confinement prevented the victim from summoning assistance. I remember her testimony was that there were – her family was asleep in the other areas of the house and she would not be able to summon them for help once [the appellant] removed her from the house.
>
> I think the proof is beyond a reasonable doubt that the evidence supports that he did remove her to prevent from being – from the crime being detected, the rape being detected.
>
> I further find that . . . there is sufficient evidence in the case to find beyond a reasonable doubt that the removal from her home to the backyard, a substantial distance away from her house, did reduce the [appellant's] risk of detection. Certainly, it's harder to work a crime scene in the outdoors than it would have been there in the den where she was and on the couch when he broke into her house and removed her from the house.

-16-

And, finally, I find that the proof supports beyond a reasonable doubt that her removal created a significant danger or increased the risk of harm independently of that posed by just the rape alone.

We agree with the trial court. The proof at trial revealed that the appellant unscrewed the motion-activated lights outside the victim's residence, entered the victim's home, found her sleeping on the couch and her husband sleeping in another room, and woke her by placing his hand over her eyes and telling her to be quiet. With the implied threat of violence, he led her outside to a wooded area, away from her house and her family, where he taped her eyes shut, ordered her to undress, and forced her to perform fellatio and have intercourse. After being startled by a barking dog, he led the blindfolded victim back to her house and instructed her to wait before contacting police. We agree with the trial court that the proof was overwhelming that the removal and/or confinement of the victim went beyond that necessary to perpetrate the rape or the aggravated burglary. See State v. Rochelle Bush, No. W2011-02721-CCA-R3-CD, 2013 WL 1197859, at *7 (Tenn. Crim. App. at Jackson, Mar. 25, 2013); State v. Jonathan Kyle Hulse, No. E2011-01292-CCA-R3-CD, 2013 WL 1136528, at *14 (Tenn. Crim. App. at Knoxville, Mar. 19, 2013). Therefore, we conclude that the error "did not contribute to the verdict obtained" and was harmless beyond a reasonable doubt. Rodriguez, 254 S.W.3d at 371.

### III. Conclusion

In sum, we conclude that the trial court did not err in denying the appellant's motion to suppress, that the evidence was sufficient to sustain the appellant's convictions, and that the jury instruction regarding aggravated kidnapping, while error, was harmless. Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-17-